Katzmann, J.
In this case we consider whether the defendants’ special motion to dismiss the plaintiffs’ defamation claim pursuant to G. L. c. 231, § 59H, widely known as the “anti-SLAPP”[3] statute, was properly denied. The central question is whether, during a period of crisis when Steward Carney Hospital (Carney Hospital or hospital) faced the loss of its license to operate an in-patient adolescent psychiatric unit (unit) because of purported patient abuse and neglect, statements quoted in a newspaper made by the president of the hospital, and an electronic mail message (e-mail) the president sent to hospital staff announcing the dismissal of unnamed employees in the unit under review, constituted protected petitioning activity. A judge in the Superior Court denied the motion because she found that the statements upon which the claim was based did not qualify as protected petitioning activity and, therefore, the defendants could not seek protection of the anti-SLAPP statute. We conclude that the statements quoted in the newspaper constitute protected petitioning activity, but that the internal e-mail does not. Accordingly, we affirm in part and reverse in part.
Background. The key facts of this case, as derived from the judge’s decision below, the newspaper articles at issue, affidavits by those involved in the investigation, testimony in a related arbitration proceeding (see note 4, infra), and relevant reports, are as follows. The plaintiffs are all registered nurses (RNs) who had been working in the unit for a number of years. In April, 2011, complaints were made concerning four incidents of alleged patient abuse or neglect within the unit. None of the alleged incidents involved abuse or neglect of a patient by any of the plaintiffs (or any other RN). The incidents were reported to the Department of Mental Health (DMH), the Department of Public Health (DPH), and the Department of Children and Families *99 (DCF) by unit RNs or other staff. The unit is licensed by DMH and DPH. After the April complaints, the agencies, especially DMH, were regularly on site to investigate the incidents and to determine whether to revoke the license to operate the unit. The director of licensing at DMH reported making unannounced visits on different occasions, including weekends and holidays, so that she could “see in fact what was happening.”
In late April, 2011, in response to the incidents, Carney Hospital placed all mental health counsellors, all regularly assigned unit RNs (including the plaintiffs), and two managers on paid administrative leave. The hospital then hired Attorney Scott Harshbarger and his law firm, Proskauer Rose, LLP (Proskauer defendants), to conduct an over-all management review of the unit and make recommendations. Harshbarger interviewed unit staff, including each of the plaintiffs. The plaintiffs identified specific issues that affected patient care and areas for improvement. On May 13, 2011, Harshbarger made an oral report of his conclusions to the hospital’s then president, William Walczak; Harshbarger submitted his written report on May 26, 2011. In the report, which made no specific allegations of abuse or neglect against any of the individual plaintiffs or any member of the nursing staff, Harshbarger recommended that the hospital “rebuild” the unit by replacing all of its personnel. The report cited “serious weaknesses” in the supervisory and managerial structure of the unit, including, inter alia, “lack of a clear reporting structure, lack of accountability, oversight of patient care and quality, patient and staff safety concerns, and a flawed and rarely invoked disciplinary process.” The report cited a “code of silence” as one of the underlying sources and causes of operational and performance dysfunction. “This code results in a failure to report issues or concerns, and to reinforce a general attitude that reporting can trigger retaliation, intimidation, and/or be ignored or unsupported by others.” The report concluded that “it would be prudent to replace the current personnel in order to ensure quality care” for the patients.
The day that Walczak received Harshbarger’s report, he sent a letter to each plaintiff terminating her for her “conduct at work.”[4] *100 On May 27, 2011, Walczak sent an e-mail to all hospital staff, which stated in pertinent part:
“As you all know, Carney Hospital has a rich tradition of providing excellent care to our patients. Our performance on national quality and safety standards is exceptional, and in many cases superior to competing hospitals. The reason for this performance is simple — you[,] the employees and caregivers at Carney [Hospital], are dedicated to providing the best possible care to every patient that comes through our doors. It is your dedication that makes Carney Hospital such a special place.
“Recently, I have become aware of alleged incidents where a number of Carney [Hospital] staff have not demonstrated this steadfast commitment to patient care. I have thoroughly investigated these allegations and have determined that these individual employees have not been acting in the best interest of their patients, the hospital, or the community we serve. As a result, I have terminated the employment of each of these individuals.”
The following day, on May 28, 2011, the Boston Globe published an article stating that Walczak said he had hired Harsh-barger to investigate an allegation that an employee had allegedly sexually assaulted a teenager on the locked adolescent psychiatry unit, and that Harshbarger had recommended “to start over on the unit.” The article included Walczak’s statement that Harshbarger’s report “described ‘serious concerns about patient safety and quality of care.’ ” The article reported that Walczak further stated, “We will have top-notch employees replace those who left. My goal is to make it the best unit in the state.” In the article, a spokesman for the Massachusetts Nurses Association, a union representing the plaintiffs, said that the “hospital fired 29 employees, including 13 nurses who are members of the union.”
In June, 2011, DMH issued reports on the incidents, finding wrongdoing by a single mental health counsellor for the first three *101 incidents and finding improper actions by unspecified staff for the fourth incident. In a June 22, 2011, Boston Globe article, it was reported that the firing of twenty-nine nurses and mental health counsellors at Carney Hospital followed five complaints of abuse or neglect in the adolescent psychiatry unit, not just the one complaint as initially disclosed, and that four of the complaints had been validated. While declining to provide details on the cases, Walczak was quoted in the article as stating that ‘“[t]he Harshbarger report indicated that it wasn’t a safe situation.” The article explained that Walczak based his decision to fire the entire staff ‘“on an investigation by former Attorney General Scott Harshbarger and his law firm.” The article quoted a letter from the Massachusetts Nurses Association to Carney Hospital nurses as stating that the nurses “adamantly deny any allegations of wrongdoing.”
On May 24, 2013, the plaintiffs filed their defamation claims against the Proskauer defendants[5] and against Carney Hospital, two related entities, and Walczak (collectively, Steward defendants).[6] Relevant to the instant appeal, pursuant to the anti-SLAPP statute, the Steward defendants filed a special motion to dismiss count 3 of the complaint (defamation), which alleged that Walczak “made false and defamatory statements about the plaintiffs to the general public in his remarks in the Boston Globe articles of May 28, 2011, and June 22, 2011,” and “made false and defamatory statements about the plaintiffs to Hospital staff in his email of May 27, 2011.” The judge denied this motion, *102 finding that neither Walczak’s statements to the Boston Globe nor his e-mail to the hospital staff constituted protected petitioning activity. The Steward defendants now appeal from the denial of their motion.
Discussion. 1. Overview, a. The anti-SLAPP statute. The anti-SLAPP statute, G. L. c. 231, § 59H, “protects the ‘exercise of [the] right of petition under the constitution of the United States or of the [C]ommonwealth,’ by creating a procedural mechanism, in the form of a special motion to dismiss, for the expedient resolution of so-called ‘SLAPP’ suits.” Office One, Inc. v. Lopez, 437 Mass. 113, 121 (2002) (Office One, Inc.). “In the preamble to 1994 House Doc. No. 1520, the Legislature recognized that . . . ‘there has been a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for redress of grievances.’ ” Duracraft Corp. v. Holmes Prods. Corp., 427 Mass. 156, 161 (1998) (Duracraft). Under the “well-established [two-part] burden-shifting test,” Hanover v. New England Regional Council of Carpenters, 467 Mass. 587, 595 (2014), “[t]o invoke the statute’s protection, the special movant[s], [here, the Steward defendants, must] show, as a threshold matter, through pleadings and affidavits, that the claims against [them] are . . . ‘based on’ [their] petitioning activities alone and have no substantial basis other than or in addition to [their] petitioning activities.” Office One, Inc., supra at 122, citing Duracraft, supra at 167-168. Wenger v. Aceto, 451 Mass. 1, 5 (2008) ( Wenger). This is the first prong of the test. Under the second prong, if the special movants make such a showing, the burden then shifts to the nonmoving party to demonstrate by a preponderance of the evidence that the moving party’s activities were “devoid of any reasonable factual support or any arguable basis in law” and that the petitioning activities caused actual injury. Benoit v. Frederickson, 454 Mass. 148, 152-153 (2009) (Benoit), quoting from G. L. c. 231, § 59H.
“In order to determine if statements are petitioning, we consider them in the over-all context in which they were made.” North Am. Expositions Co. Ltd. Partnership v. Corcoran, 452 Mass. 852, 862 (2009) (Corcoran). “ ‘[Petitioning’ has been consistently defined to encompass a ‘very broad’ range of activities in the context of the anti-SLAPP statute.” Id. at 861, citing Duracraft, supra at 161-162. “The statute identifies five types of statements that comprise ‘a party’s exercise of its right of petition’:
*103 ‘[1] [A]ny written or oral statement made before or submitted to a legislative, executive, or judicial body, or any other governmental proceeding; [2] any written or oral statement made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other governmental proceeding; [3] any statement reasonably likely to encourage consideration or review of an issue by a legislative, executive, or judicial body or any other governmental proceeding; [4] any statement reasonably likely to enlist public participation in an effort to effect such consideration; or [5] any other statement falling within constitutional protection of the right to petition government.’ G. L. c. 231, § 59H.“ (Emphasis added.)
Cadle Co. v. Schlichtmann, 448 Mass. 242, 248 (2007) (Cadle Co.). The second category is of particular relevance to the instant case.
b. Standard of review. As has been stated, we review the judge’s decision to grant the special motion to dismiss for abuse of discretion or error of law. See Marabello v. Boston Bark Corp., 463 Mass. 394, 397 (2012); Hanover v. New England Regional Council of Carpenters, 467 Mass. at 595. We note that while this formulation appears in various anti-SLAPP decisions, there are other cases where it is absent. See, e.g., Corcoran, 452 Mass. 852; Benoit, 454 Mass. 148; Ehrlich v. Stern, 74 Mass. App. Ct. 531 (2009) (Ehrlich). In any event, with respect to the first prong of the test — whether conduct as alleged on the face of a complaint qualifies as protected petitioning activity — it does not appear that the courts have deferred to the motion judge but rather have made a fresh and independent evaluation. See, e.g., Corcoran, 452 Mass. at 863-864 (discussing Cadle Co., 448 Mass. 242 [2007]); Plante v. Wylie, 63 Mass. App. Ct. 151, 160-161 (2005) (Plante). Where the motion judge’s determination of the second prong of the two-part test does not implicate credibility assessments, it is arguable that appellate review should be similarly de novo. See, e.g., Benoit, 454 Mass. at 154 n.7 (discussing the appropriate standard of review with respect to the analysis of the second prong of the two-part test).[7]
*104 We conclude that whether we review the judge’s denial of the motion to dismiss de novo or with discretion, the ruling was in error with respect to the statements to the Boston Globe, but was not in error with respect to the e-mail sent to hospital employees.
2. Standing. At the outset we briefly address and reject the plaintiffs’ standing argument. The plaintiffs contend that the anti-SLAPP statute does not apply because Walczak is not personally aggrieved by the agencies’ actions and was not petitioning them on his own behalf. Keegan v. Pellerin, 76 Mass. App. Ct. 186, 191-192 (2010), is dispositive on this issue. Here, Walczak, who engaged in petitioning activity on behalf of the hospital while he was its president, is protected by the anti-SLAPP statute because “when a nongovernmental person or entity is the petitioner, the statute protects one who is engaged to assist in the petitioning activity under circumstances similar to those this record reveals.” Id. at 192, citing Plante, 63 Mass. App. Ct. at 156-157. See Office One, Inc., 437 Mass. at 121-124. See also Corcoran, 452 Mass. 852 (2009) (underlying suit named the defendants’ principal, whose statements were challenged, as an individual defendant).[8] Walczak thus has standing.
3. The statements to the Boston Globe. By way of overview, we note our conclusion, discussed infra, that the judge erred in concluding that Walczak’s statements to the Boston Globe “can[not] be considered petitioning activity under Massachusetts law.” We disagree with the stark contrast the judge drew between the Proskauer defendants’ statements in the report and the statements the Steward defendants made in the Boston Globe articles. *105 The judge, citing Kobrin v. Gastfriend, 443 Mass. 327, 333 (2005) (Kobrin), for the proposition that the anti-SLAPP statute applies only where a “party seeks some redress from the government,” found it “clear that the statements in Harshbarger’s report constitute petitioning activity in that they were aimed at persuading the regulatory agencies involved not to revoke Carney Hospital’s license.” The judge noted that, in response to DMH’s threat to close the unit, Harshbarger was recruited and was required to “interface with the various regulatory agencies and personnel on behalf of Carney Hospital and develop remedies so that the Hospital could retain its license and prevent the Unit from being closed.” The pleadings and affidavits indicate that the Steward defendants’ overarching goal was the same as that of the Pros-kauer defendants: to ensure that the hospital retained its license and to prevent the unit from being closed.[9] The strategy was to take a comprehensive approach to fixing the problems at the unit to demonstrate to DMH that the unit should maintain its license. In short, with respect to the statements to the Boston Globe, we do not discern a consequential distinction between the conduct of the Steward defendants and the Proskauer defendants. Walczak’s statements were made and designed to achieve the same goal and also qualify as protected petitioning activity.
a. Specifically, the parties disagree as to whether Walczak’s statements in the Boston Globe articles on May 28, 2011, and June 22, 2011, qualify as protected petitioning activity. We conclude, as this court did in Wynne v. Creigle, 63 Mass. App. Ct. 246, 254 (2005) (Creigle), that Walczak’s statements “were sufficiently tied to and in advancement of’ the maintenance of the license to operate the unit. In Creigle, there were two independent bases on which the defendant’s statements to the newspaper were found to be protected petitioning activity. One basis was that the *106 statements “were sufficiently tied to and in advancement of’ the defendant’s petition for benefits then under consideration by the Legislature, and, “thus, they fall within the ambit of statements made ‘in connection with’ legislative proceedings within the meaning of G. L. c. 231, § 59H, and constitute protected petitioning activity on that basis.” Ibid. The second basis was that the context in which the defendant’s statements to the newspaper occurred was as a response to the materials the plaintiff had earlier provided to the newspaper, and the fact that the defendant’s statements were “essentially mirror images” of statements she had made in an earlier governmental investigation of the plaintiff. Ibid. In Cadle Co., 448 Mass. at 251, the court further emphasized the importance of context when, in distinguishing Creigle, it noted that unlike Creigle, in Cadle Co., there was “nothing in the record [to] support a finding that the [defendant’s] challenged statements . . . were either a response to statements that [the plaintiff] had made to the press or repetitions of statements initially made in a governmental proceeding.”
We similarly conclude from the content of the Boston Globe articles, particularly the June 22 article, and from Walczak’s affidavit, which was not challenged by the plaintiffs, that the “defendant’s statements were not unsolicited” but, rather, were responsive. In his affidavit, Walczak states that he “understood that representatives from the nurses’ union were commenting to the media on the terminations and that the media was also seeking commentary from current and former officials from the very regulatory agencies who were in the process of reviewing Carney Hospital’s licensing status. As such, [he] felt that it was important that [he] explain to the media, and hence to the general public and the agencies themselves, why Carney Hospital took the actions that it did, and what [their] plans were for ensuring the safety and care of our patients going forward.” The relevant Boston Globe articles include statements and perspectives from the nurses’ representatives that demonstrate that they were actively informing reporters about the nurses’ side of the story, denying any allegations of wrongdoing. Harshbarger noted in his affidavit that there was public pressure on the agencies to close the unit and withdraw its license. Walczak’s comments, when viewed in this context, qualify as protected petitioning activity because the investigation was ongoing, and it is clear that DMH, which was regularly on site at the hospital, would be paying attention, or at least would have access to these articles. If Walczak did not *107 respond, there would have been a serious risk that the situation would be reported in a manner that did not take into account the Steward defendants’ perspective. Walczak’s statements to the Boston Globe were designed to communicate to the regulatory agencies that the hospital was taking action to avoid losing its license to operate the unit. Even within the articles at issue here, professionals in the local health care arena, including some former and current officials of the reviewing agencies, commented on and evaluated Walczak’s course of action, commending the serious steps he took to address the incidents, and noting DMH’s approval of his actions. Indeed, in Walczak’s affidavit, he stated that it was his
“sincere belief that [his] comments to the media would reach the regulators with the message that Carney Hospital had taken the incidents very seriously, implemented immediate remedial action, and developed a plan of action, all of which would contribute to convincing the agencies that patient safety was a priority and that the Unit should remain licensed and open.”
With the agencies continuously monitoring the situation and the unavoidable publicity that developed around it, the media essentially became a venue to express the perspectives of each side; as such, the Boston Globe articles were available to, and likely considered by, the regulatory agencies. The judge erred in concluding that the statements to the Boston Globe were not protected activity on the ground that the Steward defendants, both directly and through Harshbarger, “already were in communication with the agencies regarding their investigation.” This conclusion ignored Harshbarger’s averments regarding those communications. His affidavit stated, “At this point, DMH’s investigation was ongoing and the possibility that the Unit’s license to operate would be revoked and the Unit would be closed was still not only being considered, but highly likely. There was some public pressure on the agencies to close the Unit and withdraw the necessary license.”
Walczak’s statements in the Boston Globe describing the actions the hospital had taken — particularly where there was ongoing public pressure on the agencies to close the unit and to withdraw the hospital’s license to operate the unit — were important affirmations, as they came from the president of the hospital himself in support of the urgent goal of influencing DMH *108 to preserve the license, and were thus legitimate protected activity. Cf. Benoit, 454 Mass. at 153 (motion judge erred in concluding that petitioning activities were not “legitimate”). In attempting to reach and educate through the media the opponents in the public who had been pressuring the agencies to revoke the license, Walczak’s statements possessed the characteristics of petitioning activity. Contrast Burley v. Comets Community Youth Center, Inc., 75 Mass. App. Ct. 818, 823-824 (2009) (Burley) (statements made to the defendant’s employees that the plaintiff was banned from a skating rink for inappropriate behavior were not protected petitioning activity where there was no link shown between the employees and the relevant governmental body).
In context and in totality, Walczak’s statements to the Boston Globe were in furtherance of the overriding strategic mission of bringing to bear upon the regulatory decisionmakers the seriousness of the hospital’s effort to reform the institution. As such, the Steward defendants have satisfied their burden of making a threshold showing that the plaintiffs’ “claims [are] ‘based on’ [the] petitioning activit[y] alone and have no substantial basis other than or in addition to [the] petitioning activit[y].” Office One, Inc., 437 Mass. at 122, citing Duracraft, 427 Mass. at 167-168. Contrast Global NAPS, Inc. v. Verizon New England, Inc., 63 Mass. App. Ct. 600, 605 (2005) (Global NAPS, Inc.). That the statements in the media were not made directly to the regulatory agencies does not remove them from protected petitioning activity, given that the ultimate audience was those agencies. Wal-czak’s statements to the Boston Globe were protected petitioning activity because they were made “to influence, inform, or at the very least, reach governmental bodies — either directly or indirectly” (emphasis added). Corcoran, 452 Mass. at 862, quoting from Global NAPS, Inc., 63 Mass. App. Ct. at 605.
We also conclude that Walczak’s statements in the Boston Globe articles qualify as protected petitioning activity on the alternative basis that they are “essentially mirror images” of statements in the report. In essence, the plaintiffs argue that in order to qualify as “mirror images,” the statements in the Boston Globe and the report must be identical. The case law, however, indicates that the contested statements do not have to be an exact match but rather must be only “essentially” mirror images of the protected statements. Creigle, 63 Mass. App. Ct. at 254. See Burley, 75 Mass. App. Ct. at 823. We interpret the qualifier “essentially” as requiring only that the statements be close to or *109 very similar to the protected statements. While the report is significantly more thorough and detailed, Walczak’s statements maintain the same tone and content, summarizing the report to respond succinctly and effectively to press inquiries and statements by the nurses’ representatives. Walczak’s statements to the Boston Globe convey the content of the report, which the hospital commissioned specifically to assure the investigating agencies that it was taking the requisite action to fix the problem. Taken in context, Walczak’s repetition of the report’s content to the media also possessed the characteristics of petitioning activity. See Creigle, supra at 253-254.
b. Our focus now shifts to the plaintiffs, because even though we conclude that with respect to the statements to the Boston Globe, the plaintiffs’ claim was “based on” the defendants’ protected petitioning activity, the plaintiffs have the opportunity to defeat the special motion to dismiss the defamation count based on those statements by showing, “by a preponderance of the evidence, that ... the defendants’ petitioning activity [was] devoid of any reasonable factual [or legal] support... and that... the activity caused the plaintiffs actual harm.” Office One, Inc., 437 Mass. at 123. See Duracraft, 427 Mass. at 165; Wenger, 451 Mass. at 5, citing G. L. c. 231, § 59H; Chiulli v. Liberty Mut. Ins., Inc., 87 Mass. App. Ct. 229, 233-234 (2015). See also Baker v. Parsons, 434 Mass. 543, 554-555 (2001) (Baker) (to defeat a special motion to dismiss defamation claims, the plaintiff had the burden of showing “by a preponderance of evidence that the defendants lacked any reasonable factual support for their petitioning activity”).
The plaintiffs have failed to show that the defendants’ petitioning activity, as constituted by the statements to the Boston Globe, was devoid of factual or legal support.[10] “Because the plaintiffs failed to show that the petitioning activity in issue was devoid of any reasonable factual basis or basis in law, it is not necessary to reach the question whether the activity caused the plaintiffs actual injury.” Office One Inc., 437 Mass. at 124. See Creigle, 63 Mass. *110 App. Ct. at 255. See also Dickey v. Warren, 75 Mass. App. Ct. 585, 592 (2009). In drafting G. L. c. 231, § 59H, the “Legislature intended to immunize parties from claims ‘based on’ their petitioning activities,” Duracraft, 427 Mass. at 167, and we conclude that the claims in the instant case concerning the Boston Globe articles are exactly the type that the Legislature had in mind. See Baker, 434 Mass. at 551 (noting that defamation is the “most popular SLAPP cause of action,” the court concluded that the “initial showing by the defendants that the claims against them were based on their petitioning activities alone is not defeated by the plaintiffs conclusory assertion that certain statements made by the defendants in petitions to government officials constitute defamation” [quotation and citation omitted]).
4. The e-mail sent to Carney Hospital staff. We turn now to the e-mail that Walczak sent on May 27, 2011, to the Carney Hospital staff. In that e-mail, he noted the hospital’s “rich tradition of providing excellent care to our patients,” that he had “become aware of the alleged incidents where a number of Carney [Hospital] staff have not demonstrated this steadfast commitment to patient care,” “that these individual employees have not been acting in the best interest of their patients, the hospital, or the community we serve,” and that “[a]s a result, [he had] terminated the employment of each of these individuals.” In his affidavit filed in the litigation below, Walczak avers that the e-mail was sent “not only to communicate to the hospital employees what was happening, but to give assurances to the regulatory agencies who were in the process of determining whether Carney Hospital’s license to operate the Unit should be revoked that the deficiencies which has [sic] been reported on the Unit would not continue in that Unit or be tolerated in any other part of Carney Hospital.”[11]
Regarding whether the e-mail could qualify as petitioning activity, the Superior Court judge ruled: “With respect to the email which Walczak sent to the internal employees of Carney Hospital, this communication cannot be considered petitioning activity protected by G. L. c. 231, § 59H. The Steward Defend *111 ants have not shown how the statements in the email, communicated only to Carney Hospital employees, were intended to influence, inform, or reach, directly or indirectly, governmental agencies. See Global NAPS, Inc., 63 Mass. App. Ct. at 605.” (Emphasis added.)
During the hearing on the anti-SLAPP motion to dismiss, the judge appropriately indicated that she could ‘“look at the[ ] affidavits.” There was no allegation or averment in Walczak’s affidavit, or in any of the other affidavits presented to the judge, that the e-mail sent to the Carney Hospital staff was provided to the regulators, or that the regulators were told about it. That the e-mail may have been part of an over-all strategy to address the conditions in the unit in the hope of influencing the regulators is not sufficient to qualify as petitioning activity where there is no evidence in the record that the e-mail was transmitted to the regulators or that they were informed of that communication. In sum, we cannot say that the judge erred in her determination that the Steward defendants had ‘“not shown [that] the statements in the email, communicated only to Carney Hospital employees,” qualified as protected petitioning activity.[12] Compare Burley, 75 Mass. App. Ct. at 823 (moving party failed to show that statements to employees were made ‘“in conjunction with its protected petitioning activity”).
Conclusion. The order of the Superior Court is reversed insofar as it denied the Steward defendants’ special motion to dismiss count 3 of the plaintiffs’ complaint (defamation) as to Walczak’s statements to the Boston Globe. In all other respects the order is affirmed.[13],[14]

So ordered.

 “ ‘SLAPP’ is an acronym for Strategic Lawsuit Against Public Participation.” Office One, Inc. v. Lopez, 437 Mass. 113, 121 n.13 (2002).

 In their complaint against the hospital, two related entities, and Walczak (Steward defendants), alleging defamation, the plaintiffs stated that the Massachusetts Nurses Association, a union representing the plaintiffs, had filed grievances on their' behalf, that the hospital had denied those grievances, and that an arbitrator had “found that [the Steward defendants] had violated the [collective *100 bargaining agreement] by discharging the grievants.” According to the complaint, the arbitrator stated that “the concept of collective guilt and responsibility does not suffice to establish just cause to terminate any particular' member of the group,” and ordered reinstatement, removal of any allegations or findings of wrongdoing from the grievants’ personnel files, and payment to them of all lost back wages and benefits, with interest. The complaint stated that the Steward defendants have appealed the award and have not reinstated any of the plaintiffs.

 Counts 4 and 5 of the complaint were against the Proskauer defendants, for defamation and infliction of emotional distress. The defamation claim was based on Harshbarger’s statements in his written report and oral presentation to the Steward defendants. The Proskauer defendants filed a special motion to dismiss the defamation claim pursuant to the anti-SLAPP statute. The judge allowed this motion, finding that the statements contained in Harshbarger’s report, in the context in which they were made, constituted petitioning activity protected under G. L. c. 231, § 59H. Subsequently, all claims against the Proskauer defendants were dismissed with prejudice on the parties’ stipulation; judgment entered for the Proskauer defendants on May 27, 2014.

 Counts 1-3 of the plaintiffs’ complaint are against the Steward defendants. Of these, only count 3 (defamation) is at issue in this appeal. At the motion hearing, the Steward defendants waived their' motion to dismiss counts 1 and 2 pursuant to Mass.R.Civ.P. 12(b)(6), 365 Mass. 754 (1974), subject to renewal as a motion for summary judgment. (Count 1 alleges retaliatory discharge based on whistleblower activity; count 2 alleges violations of G. L. c. 119, § 51 A, for the discharge of two of the plaintiffs after they reported abuse or neglect of patients on the unit.)

 In Benoit, the Supreme Judicial Court explained:
“The anti-SLAPP statute requires the judge to consider the pleadings and supporting and opposing affidavits. The question to be determined by *104 a judge in deciding a special motion to dismiss is not which of the parties’ pleadings and affidavits are entitled to be credited or accorded greater weight, but whether the nonmoving party has met its burden (by showing that the underlying petitioning activity by the moving party was devoid of any reasonable factual support or arguable basis in law, and whether the activity caused actual injury to the nonmoving party).”
454 Mass. at 154 n.7.

 The cases upon which the plaintiffs rely to contest standing - Kobrin v. Gastfriend, 443 Mass. 327, 332 (2005); Fisher v. Lint, 69 Mass. App. Ct. 360, 364-365 (2007); and Moriarty v. Mayor of Holyoke, 71 Mass. App. Ct. 442, 447 (2008) — were specifically distinguished by the Keegan com! because those cases “rest on the commonsense principle that a statute designed to protect the constitutional right to petition has no applicability to situations in which the government petitions itself.” Keegan v. Pellerin, 76 Mass. App. Ct. 186, 192 (2010). This is not a case in which the government was petitioning itself; rather, Walczak was petitioning on behalf of his employer, the hospital. See ibid.

 The affidavit of Michael R. Bertoncini, deputy general counsel of one of the Steward defendants during the relevant time period, explained, “The leadership of [his client] and Carney Hospital believed that swift and decisive action was necessary to ensure the safety of patients in the Unit, to respond to the concerns of the DMH/DCF personnel on the scene, and to work with and persuade the relevant regulatory agencies not to suspend Carney Hospital’s license to operate the Unit and not to close the Unit.” Bertoncini also stated that his client and the hospital hoped that the hiring of Harshbarger to conduct the review and the “corresponding response would provide clear and convincing evidence and support for the position that the Unit should not lose its license to operate, should not be closedf,] and should be given the opportunity to effect a comprehensive remedy.”

 The plaintiffs acknowledge that “no such showing was made — or attempted” because “they in fact supported Steward’s advocacy goal: the preservation of the Unit’s license.” We do not agree that this explains the plaintiffs’ silence on this point. While the plaintiffs may have had an interest in preservation of the license, they did not share the goal of staffing the unit with new staff. It was thus incumbent upon the plaintiffs to show the absence of factual or legal support for the statements they assert were defamatory.

 Walczak’s affidavit further states:
“On May 27, 2011, I sent an email to all Carney Hospital employees reaffirming Carney Hospital’s commitment to providing the best possible care to every patient that comes through the doors and explaining the reasons why I decided to terminate the employment of individuals who, in my view, had not lived up to that standard.”

 Having determined that the Steward defendants have not satisfied the first prong of the two-part test, we need not address the second prong regarding proof of factual or legal support.

 See Wenger, 451 Mass. at 2, 9 (denying a special motion to dismiss with respect to a G. L. c. 93A claim and allowing the special motion to dismiss as to malicious prosecution and abuse of process claims). Under the circumstances here, where the e-mail and statements to the Globe were distinct actions clearly set forth in the defamation count and could readily have been the subject of separate counts, the complaint differs from that presented in Ehrlich, 74 Mass. App. Ct. at 534, where such delineation was absent. But see Burley, 75 Mass. App. Ct. at 821-824.

 As count 3 survives in part, the Steward defendants’ motion for attorney’s fees and costs pursuant to the anti-SLAPP statute is denied.